IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM R. FLETCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06 C 0842 |
| | ) | |
| CHICAGO RAIL LINK, L.L.C., CSX | ) | Judge Kennelly |
| TRANSPORTATION, INC., CSX | ) | Magistrate Judge Levin |
| INTERMODAL, INC. and CSX | ) | |
| INTERMODAL TERMINALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| CHICAGO RAIL LINK, L.L.C., CSX | ) | |
| TRANSPORTATION, INC., CSX | ) | |
| INTERMODAL, INC. and CSX | ) | |
| INTERMODAL TERMINALS, INC., | ) | |
| | ) | |
| Third Party Plaintiff's, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUTOMASTERS TIRE AND SERVICE | ) | |
| CENTER, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
CRL'S MOTION FOR SUMMARY JUDGMENT**

**I. FACTUAL SUMMARY**

Briefly stated, William Fletcher has filed an FELA complaint alleging an injury stemming from an April 7, 2005 motor vehicle accident that occurred on duty while Fletcher was driving a CRL company vehicle that did not have brakes. In the course of his medical treatment that followed the motor vehicle accident, Fletcher experienced shoulder, back and neck pain. His treating orthopedic surgeon, Dr. Baier, has recommended he receive rotator cuff surgery to repair

1

a torn rotator cuff. Fletcher contends that (1) the vehicle assigned to him by the railroad was unsafe because it did not have any brakes, (2) CRL and/or its agents knew of the problem with the brakes because a near identical brake line problem in the same vehicle occurred 10 days prior to the accident, (3) CRL, and/or its agents, knew of potential tampering with the brakes 10 days prior to the accident but failed to inform any employees of the potential tampering, and (4) that CRL should have fixed the problem with the brakes so as to provide Fletcher with a vehicle with operable brakes.

## II. PRELIMINARY STATEMENT

Title 45, U.S.C., § 51 provides in pertinent part:

> "Every common carrier by railroad while engaging in commerce between any of the several states . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . ."

The FELA has been historically construed as remedial in nature. Congress recognized the cost of human injury as an inescapable expense of the railroad industry, and was dissatisfied with the traditional concepts of master/servant law then applicable to such cases. Therefore, Congress sought to equitably allocate the inevitable costs of human injury which were associated with the railroad industry, and doctrines of the assumption of the risk and contributory negligence as complete defenses were abolished. 45 U.S.C., § 54 bars the assumption of risk defense; and 45 U.S.C., § 53 substitutes the concept of pure comparative negligence. The United States Supreme Court has construed the statute to abrogate the common law "fellow servant" doctrine, to relax the concept of "agent" as used in the Act, and to expand the concept of causation. See generally: *Chesapeake & Ohio Railway v. Deatley, 241* U.S. 310 (1916); *Sinkler v. Missouri-Pacific Railroad Co.*, 356 U.S. 326 (1958); and *Rogers v. Missouri-Pacific Railroad*

2

*Co.*, 352 U.S. 500 (1957). In short, every injury suffered by an employee during employment by reason of the railroad's negligence is compensable under the Act.

To further underscore the broad remedial policy of the Act, § 53 and § 54 of the Act provide that where the railroad violates a statute enacted for the safety of an employee, there will be no comparative fault or assumption of the risk. These statutes provide in relevant part:

> § 53 … Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.
>
> § 54 … and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

The definition of a "safety statute" has been broadly defined in § 54a which provides in relevant part:

> § 54a. A regulation, standard, or requirement in force, or prescribed by the Secretary of Transportation under chapter 201 of Title 49, … is deemed to be a statute under sections 53 and 54 of this title.

Thus, the regulations of the U.S. Department of Transportation, National Highway Traffic Safety Administration, known as the Federal Motor Vehicle Safety Standards (FMVSS), and which were in force, are a safety statute under the FELA. As such, a plaintiff protected by such a safety regulation shall not be held guilty of comparative negligence, or assumption of the risk. *Kernan v. American Dredging Co.*, 355 U.S. 426, (1958); *Pratico v. Portland Terminal Co.,* 783 F.2d 255 (1985). In the present case, Fletcher was operating a motor vehicle on a roadway and protected by these FMVSS regulations. The violation of such a regulation is negligence per se. *Kernan v. American Dredging Co.*, 355 U.S. 426, (1958).

3

The foregoing discussion simply serves to point out that as between traditional common law negligence and the Federal Employers' Liability Act, there are quantitative and qualitative differences. In other words, although the elements of negligence may remain unchanged, the quantum of evidence required to sustain the plaintiff's burden have been eased from the more traditional common law standards. Further, under the appropriate circumstances, the plaintiff is relieved of any comparative fault, and the violation of a safety statute results in a finding of negligence on the part of the railroad. *Kernan v. American Dredging Co.*, 355 U.S. 426, (1958).

### III. BURDEN OF PROOF

Although the FELA requires the injured party to prove that his railroad employer was negligent, the quantum of proof required to sustain this burden has been substantially reduced in contrast to the traditional negligence case. *Harbin v. Burlington Northern Ry. Co.,* 921 F.2d 129 (7th Cir. 1990); *Heater v. Chesapeake & Ohio Railway Co.*, 497 F.2d 1243 (7th Cir. 1974), cert. denied, 419 U.S. 1013, (1974). The quantum of fault necessary to support a finding of railroad liability was resolved by the United States Supreme Court in the landmark case of *Rogers v. Missouri-Pacific Railroad Co.,* 352 U.S. 500 (1957), wherein the Court stated:

> Under the statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence *played any part even the slightest* in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. *Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that <u>negligence of the employer played any part at all in the injury or death.</u>* (Emphasis supplied) *Rogers* at 506, 507.

Under *Rogers*, the plaintiff need only demonstrate that the employer was negligent in some capacity and that its negligent conduct contributed in some degree to the employee's injury.

4

The standard for submission of a case to the jury under Seventh Circuit authorities is identical to *Rogers v. Missouri-Pacific Railroad Company, Supra.* See generally: *Harbin v. Burlington Northern Ry. Co.*, 921 F.2d 129 (7th Cir. 1990); *Heater v. The Chesapeake and Ohio Ry. Co.* 497 F.2d 1243 (7th Cir. 1974), cert. denied, 419 U.S. 1013 (1974). As noted by the Seventh Circuit Court of Appeals in the *Heater* decision:

> As one commentator has noted, "the *Rogers* formulation of the test for a jury case under the FELA reduce[s] the extent of the negligence required, as well as the quantum of proof necessary to establish it, to the 'vanishing point.' While it is still undoubtedly true that there must be some shreds of proof both of negligence and of causation, in that 'speculation, conjecture and possibilities' will not be enough, there appears to be little doubt that under the statute jury verdicts for the plaintiff can be sustained upon evidence which would not be sufficient in the ordinary negligence action." *Heater v. The Chesapeake and Ohio Ry. Co.* 497 F.2d 1243, 1247, FN 1 (7th Cir. 1974), cert. denied, 419 U.S. 1013 (1974).

The *Harbin* Decision notes several examples of FELA actions that were submitted to a jury based upon "evidence scarcely more substantial than pigeon bone broth". *Harbin v. Burlington Northern Ry. Co.*, 921 F.2d 129, 132 (7th Cir. 1990). See generally: *Gallick v. Baltimore & Ohio R.R. Co.* 372 U.S. 108 (1963); *Lavender v. Kurn*, 327 U.S. 645 (1946). Most significantly, however, the *Harbin* decision addresses the standard for the grant of summary judgment under Federal Rule of Civil Procedure 56 (c). The Court acknowledges that this standard generally demands more than a scintilla of evidence, however, the Court distinguishes actions which arise under the FELA.

> In reviewing a Motion for Summary Judgment, the Judge must thus "bear in mind the actual quantum and quality of proof necessary to support liability . . ." Id. It is well established that the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence action. *Harbin v. Burlington Northern Ry. Co.* 921 F.2d 129, 130-131 (7th Cir. 1990).

The Court further held:

> The lenient standard for avoiding summary judgment under the FELA merely mirrors the pro-plaintiff slant of the substantive law. Dissatisfied with the

5

>common law duty of the master to his servant, Congress enacted the FELA to require employers to shoulder responsibility for damages attributable in whole or in part to their negligence. See *Rogers*, 352 U.S. at 507-08. The right to a jury determination is part and parcel of the liberal remedy afforded the working person under the FELA. *Harbin* at page 131.

Thus, the evidence required "for a finding of negligence dictates a corresponding 'slightest' hurdle for avoiding a directed verdict (or equivalent procedurally a summary judgment)". *Wilson v. Chicago, Milwaukee, St. Paul, and Pacific Railroad Company,* 841 F.2d 1347, 1355 (7th Cir. 1988), cert. dismissed, 487 U.S. 1244 (7th Cir. 1988).

## IV. THE STANDARD OF REVIEW

In deciding a motion for summary judgment, the District Court must view the entire record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 195, 298 (7th Cir. 1996). "If a study of the record reveals that inferences contrary to those drawn by the trial court might be permissible, then the summary judgment should be reversed." *Munson v. Friske, et al.*, 754 F.2d 683, 690 (7th Cir. 1985). The testimony of the opposing party, even if characterized as self-serving, may create a genuine issue of material fact precluding summary judgment where the testimony is not inherently incredible. *Wilson v. Chicago, Milwaukee, St. Paul and Pacific Railroad Company*, 841 F.2d 1347, 1355 (7th Cir. 1988) cert. dismissed, 487 U.S. 1244 (1988).

## V. THE FELA STANDARD OF CARE:
### *AGENCY UNDER THE FELA & CRL'S "NONDELEGABLE DUTY"*

Under the FELA, CRL may not escape liability for negligence by delegating operational functions to third parties, and CRL may be found liable to an employee plaintiff for injuries resulting from the negligent conduct of an independent contractor. See 45 U.S.C. §55; *Miles v. Pennsylvania R. Co.*, (1950, CA7 Ill) 182 F2d 411; *Missouri K.T.R. Co. v. Hearson*, (1970, CA 10 Kan) 422 F2d 1037; *Moore v. Industrial Com. Of Ohio* (1934), 49 Ohio App 386, 3 Ohio Ops

6

275, 18 Ohio L Abs 85, 197 NE 403; *Klar v. Erie R. Co.* (1928) 118 Ohio St 612, 6 Ohio L Abs 358, 162 NE 793, app dismd 279 US 818, 73 L Ed 975, 49 S Ct 342; *Spoto v. Soo Line*, 1995 U.S. Dist. Lexis 5794 at 3.

This "nondelegable duty" to provide its employees with a safe place to work further illustrates the broad remedial nature of the FELA. For example, a railroad has a "nondelegable duty" to provide its employees with a safe place to work, even when they are on property owned by a third party over which the railroad has no control. *Shenker v. Baltimore & Ohio Railroad Co.*, 374 U.S. 1 (1963); *Payne v. Baltimore & Ohio R.R.,* 309 F.2d 546 (6th Cir. 1962), cert. denied 374 U.S. 827, (1963). As stated in the *Payne* decision:

> This is so despite the fact that the railroad may not own, control, or be under a primary obligation to maintain the premises on which the employee is injured . . . Under the FELA the employer (railroad) is the one owing the duty to the employee. **The employee need not look elsewhere for his protection. He has a right under the FELA to rely on his employer and none other. When the employer delegates its duty, or abdicates its control, the employer (railroad) takes the risk, not the employee**. (Emphasis supplied) *Payne* at 549.

The employer is also under a continuous duty to exercise ordinary care to provide its employees with reasonably safe and suitable tools, machinery, and appliances with which to work, and an employee may rely on the assumption that the employer has exercised such care. *Ragsdell v. Southern Pacific Transportation Co.*, 688 F.2d 1281 (1981). In this case, CRL relied upon Automasters to maintain its fleet of vehicles, including the Suburban. *CRL 56.1 ¶ 30.* In fact, CRL has sued Automasters for negligently repairing the Suburban involved in this instance, and CRL is responding to Automasters motion for summary judgment at the very moment this response is being filed. As such, whatever negligence allegations against Automasters maintained by CRL are imputed in Fletcher's FELA case because of the "nondelegable duty" owed to railroad employees under the FELA.

This Circuit observed in *Harbin* that it "is the province of the jury to weigh myriad factors, including the nature of the task and the hazards it entails, in determining whether employer fault played any role in the employee's injury." *Harbin v. Burlington Northern Ry. Co.*, 921 F.2d 131, (7th Cir. 1990). Further, under *Harbin*, the Plaintiff is not required to produce technical scientific evidence in support of his claim. As this Court stated, "[W]e decline the railroad's invitation to constrict the generous provisions of the statute by imposing upon FELA claimants the burden to produce such technical scientific evidence." *Harbin* at 132. In *Harbin*, the Court made the following pertinent observation:

> A long line of FELA cases reiterate the lesson that the statute vests the jury with broad discretion to engage in common sense inferences regarding issues of causation and fault. See *Rogers*, 352 U.S. at 510, 77 S. Ct. at 450 ("The decisions of this Court . . . teach that the Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury.") The jury is the tribunal to which is delegated the duty to apply the elusive concepts of reasonable care and cause and effect to the manifold facts and circumstances of each individual case. See *Bailey*, 319 U.S. at 353-54, 63 S. Ct. at 1064-65. *A jury is as qualified to infer a general risk of harm to employees forced to labor without ventilation in a sooty environment as it is to infer the possibility of injury from a rusty wire left lying about, or a stagnant pool of water, or the lifting of a heavy weight. Thus, in Heater, 497 F.2d at 247, the court concluded that a jury could reasonably infer risk to employees who were directed to shift heavy weights.* And in *Caillouette*, 705 F. 2d at 246-67, the court upheld a jury verdict for a plaintiff who tripped upon a rusty wire carelessly left lying about on the Railroad's premises. (Emphasis supplied.) *Harbin* at 132.

After reviewing the evidence submitted, the *Harbin* Court reversed the District Court's grant of summary judgment.

In its motion for summary judgment, Defendant CRL states that there is no evidence of essentially three allegations: (1) failure to warn of an unsafe condition, (2) failure to inspect the vehicle and (3) failure to secure the vehicle from tampering. The

evidence in this case overwhelming demonstrates that CRL, and/or its agents, failed in each and every duty alleged above.

### VI. THERE IS AMBLE EVIDENCE OF NOTICE, NOTICE AND MORE NOTICE
*OR WHAT CRL KNEW, OR SHOULD HAVE KNOWN,*
*10 DAYS BEFORE APRIL 7, 2005*

CRL's argument that there was no notice or foreseeability of a loose brake line is of no moment. On March 27, 2005, Fletcher was driving the same Suburban when the brakes went out in the railroad yard. *CRL 56.1 ¶ 11*. He managed to stop the vehicle without incidence using the parking brake. *Fletcher 56.1(b)(3)(C) ¶ 1* The Suburban was towed to Automasters where it was discovered that the front brake line was loose at the master cylinder. *CRL 56.1 ¶¶12, 13, 16, 21 & 22*. Ten days later, Fletcher was again driving the Suburban when the brakes went out for the second time; this time due to a loose rear brake line. *Fletcher 56.1(b)(3)(C) ¶ 2* In its motion for summary judgment, CRL maintains that it was unforeseeable that the April 7, 2005 brake line problem would occur.

CRL relies upon outside contractors to perform all vehicle maintainence work on its vehicles used by employees. *CRL 56.1 ¶30* On March 28, 2005, CRL's automotive repair agent – Automasters – repaired a loose front brake line on the Suburban. *CRL 56.1 ¶12* On April 8, 2005, CRL's automotive repair agent – the same Automasters – repaired a loose rear brake line on the Suburban. *Fletcher 56.1(b)(3)(C) ¶ 2* Following the March 28, 2005 repair, Automasters' service manager, Steven Jurewicz, telephoned CRL and notified the company that "somebody is playing games with them," because a brake line in the usually course do not become loose on its own. *CRL 56.1 ¶¶21, 22; See also Fletcher 56.1(b)(3)(C) ¶ 3.* CRL locomotive shop foreman, Justin Moon, who took the call from Automasters after the March 28, 2005 brake repair, stated that he was told that the brake line repair was the result of "wear and tear." *CRL 56.1 ¶28* CRL's

9

own liability witness, Joseph Arruda, testified that Automasters should have informed CRL of their suspicions "that someone was playing games with them" after the March 28, 2005 repair. *Fletcher 56.1(b)(3)(C) ¶ 4.*

These two versions of what transpired after the March 28, 2005 brake line repair raise a question of fact for the jury: (1) either Automaters did not inform the CRL, *as they should have*, that the Suburban's brake lines were being loosened, or (2) CRL's Moon heard this information and did nothing to prevent another occurrence. Either way, we know it took another incident – the April 7, 2005 motor vehicle accident that injured Mr. Fletcher – before CRL took affirmative steps to inform its employees of the loose brake line issue and to attempt to prevent another occurrence. *Fletcher 56.1(b)(3)(C) ¶ 5* By all accounts, CRL's affirmative steps after Fletcher was injured to prevent another loose brake line incident worked: there has not been a single incident of a loose brake line since April 7, 2005. *Fletcher 56.1(b)(3)(C) ¶¶ 5,7 10, and 14* Moreover, CRL employees were on a heightened state of alert to the brake issue after Fletcher's accident. *Fletcher 56.1(b)(3)(C) ¶¶ 5,7 10, and 14.* The question of why CRL did not take these simple affirmative steps after knowing about the loose brake lines on March 28, 2005 – which could have prevented the accident and subsequent injury to its Conductor Fletcher – more that satisfies the notice requirement under the FELA. Thus, the evidence that CRL, and/or its agents, knew of the condition of the Suburban's brake lines 10 days prior to April 7, 2005, and did nothing to prevent a reoccurrence of the same problem, more than satisfies the required "for a finding of negligence dictates a corresponding 'slightest' hurdle for avoiding a directed verdict (or equivalent procedurally a summary judgment)". *Wilson v. Chicago, Milwaukee, St. Paul, and Pacific Railroad Company,* 841 F.2d 1347, 1355 (7th Cir. 1988), cert. dismissed, 487 U.S. 1244 (7th Cir. 1988).

It is the position of the plaintiff as contained in his own motion for summary judgment that because the federal motor vehicle safety standards (FMVSS) were violated when Fletcher was provided a vehicle without operable brakes, that this failure to comply with the FMVSS is negligence per se under the FELA. *Kernan v. American Dredging Co.*, 355 U.S. 426, (1958). But at a minimum, this fact is probative evidence of CRL's negligence, and the negligence of its automotive repair agents – Automasters -- as the FMVSS are evidence of the standard of care. *Williams v. Metra*, 2002 WL 1433724, at 5, (June 2002), *Miller v. Chicago Northwestern*, 925 F. Supp. 583, 587 (1996). Thus, there is ample evidence of CRL's negligence in the present case.

## VII. AMBLE EVIDENCE OF REASONABLE FORESEEABILITY OF HARM

The facts are 10 days before April 7, 2005, CRL knew, or should have known, that the vehicle's brake lines had been loosened on or about March 27, 2005. CRL, despite knowing this fact, did nothing between March 28 to April 7 to prevent another incident of loosening of the brake lines. *CRL 56.1 ¶28 & Fletcher 56.1(b)(3)(C) ¶¶5, 8, 9, & 15*. This is despite a finding of "soft brakes" by another CRL utility conductor on April 6, 2005 – the day before Fletcher's accident. *Fletcher 56.1(b)(3)(C) ¶8*. It took a serious employee injury to get CRL to act to prevent another incident of loosening of the brake lines, which it did by (1) contacting the police and (2) informing its employees to be vigilant in keeping their eyes and ears open to such an event. *Fletcher 56.1(b)(3)(C) ¶¶5, 6, 8, 9, & 15*.

On or about March 28, 2005, CRL's Moon was told by Automasters that "somebody is playing games with you." *CRL 56.1 ¶21* Moon did not act on this information. *CRL 56.1 ¶28* In fact, Moon doesn't remember Automasters informing him of this fact. *CRL 56.1 ¶28* If he had heard this information, he would have acted, he has testified. *Fletcher 56.1(b)(3)(C) ¶¶ 9 & 15*.

11

Moon, however, took no affirmative step to avoid another brake malfunction. *Fletcher 56.1(b)(3)(C) ¶9.*

Now, there is ample evidence that if Moon had acted on the information from Automasters, or conversely if Automasters had informed CRL of the fact that "someone was playing games" with the vehicle's brake lines, CRL Conductors would have proceeded much differently as it relates to the vehicle. *Fletcher 56.1(b)(3)(C) ¶ 14.* After Fletcher's accident, after CRL distributed memos and letters to the Bedford Park police about the incident, CRL Conductors first knew about the threat of tampering of brake lines. *Fletcher 56.1(b)(3)(C) ¶¶ 5, 7, 9, 10, & 14.* Armed with that information, CRL Conductor paid much closer inspection to the vehicles brakes in the days immediately following Fletcher's accident. *Fletcher 56.1(b)(3)(C) ¶¶ 5, 7, 9. 10, & 14.* The CRL Conductors were so attentive to the condition of the brakes that the vehicle was brought back to Automasters for a third time after it was initially repaired following Fletcher's April 7, 2005 accident. *Fletcher 56.1(b)(3)(C) ¶10* CRL Conductors, in fact, wrote up the vehicle as having "soft brakes" for six straight days following Fletcher's accident until the vehicle was taken away from Bedford Park by CRL Locomotive Shop Foreman Moon. *Fletcher 56.1(b)(3)(C) ¶14*

## VIII. AMBLE EVIDENCE OF FAILURE TO INSPECT & REPAIR

The day before the accident – April 6, 2005 – another CRL Utility conductor reported that the vehicle had "soft brakes." *Fletcher 56.1(b)(3)(C) ¶8* On March 28, 2005, Automasters repaired the vehicle's front brake line. *CRL 56.1 ¶ 12.* On April 8, 2005, after Fletcher's accident, Automasters repaired the vehicle's rear brake line. *Fletcher 56.1(b)(3)(C) ¶2.* It is only in the deposition testimony of the repair mechanics where both brake lines were loosened. CRL Utility conductors are not automotive mechanics and placing a burden on the CRL utility

12

conductor to discover a problem with the brakes during the pre-trip inspection is a classic Catch-22 – "how do you know of the problem without operating the vehicle." *Fletcher 56.1(b)(3)(C) ¶¶ 11, 12 & 13*. Conductors had to operate the vehicle to know the condition of the vehicle. When there is a problem with the vehicles brakes the CRL Conductor reports the discovered problem after the fact. *Fletcher 56.1(b)(3)(C) ¶12* Now, the evidence reveals that after the CRL Conductor was informed about the threat of loosened brake lines, the CRL Conductor paid much closer inspection to the vehicles brakes in the days immediately following FLecher's accident. *Fletcher 56.1(b)(3)(C) ¶14* The CRL Conductors were so attentive to the condition of the brakes that the vehicle was brought back to Automasters for a third time after it was initially repaired following Fletcher's accident. *Fletcher 56.1(b)(3)(C) ¶10* CRL Conductors wrote up the vehicle as having "soft brakes" for six straight days following Fletcher's accident until the vehicle was taken away from Bedford Park by Moon. *Fletcher 56.1(b)(3)(C) ¶14* Clearly, the is evidence reveals (1) the March 28, 2005 brake repair by Automasters did not fix the brakes, (2) the April 8, 2005 post-Fletcher collision repair did not fix the brakes, (3) the April 12, 2005 brake repair by Automasters did not fix the brakes, and (4) finally, on April 19, 2005, CRL Conductors were rid of the cursed Suburban when the vehicle was removed from Bedford Park by CRL Locomotiove Shop Foreman Justin Moon. *Fletcher 56.1(b)(3)(C) ¶14*

## IX. CRL'S *RES IPSA LOQUITOR* ATTACK IS *CIRCULUS IN PROBANDO*

The foregoing reveals the negligence of CRL that is necessary to support the *res ipsa loquitor* allegations. CRL nonetheless – in a profound feat of *circulus in probando* – attempts to persuade that "a vehicle's owner would not normally expect the brake fittings on a vehicle to loosen" (*CRL 56.1 ¶¶ 14, 18, & 52)* and, despite knowing that the brake fittings became loose on the vehicle 10 days prior to Fletcher's accident, did nothing in response to an extraordinary

13

safety-related event that does not occur in the normal course of events. Essentially, CRL's circular logic is that it needed two events that normally do not occur in the normal course of events in order to be warned that "someone is playing games with them." *CRL 56.1 ¶ 14*

CRL's argument against the *res ispa* allegation is a sole proximate cause defense. CRL claims on page 13 of its motion that "to the extent that plaintiff either failed to inspect the brakes as claimed or failed to detect their sabotage before the accident, Plaintiff, and not CRL, were [sic] 'in control.'" First, such an assertion is a prohibited defense as the doctrine of assumption of risk has been strictly abolished under the FELA. *45 U.S.C. § 54.* Furthermore, the evidence could not be more clear that CRL knew, or should have known, that someone was "playing games with them" after the first incident of loose brakes. CRL did not inform Fletcher or any of its conductors who used the vehicle that "someone was playing games" with the brake line on the vehicle they were directed to operate. Instead, CRL ignored Automasters' warning, and allowed the vehicle to be used by its employees. Only, after one of its employees was injured, CRL informed its employees of the loose brake line issue. *Fletcher 56.1(b)(3)(C) ¶9.*

## X. CONCLUSION

The plaintiff's submits that ample evidence of notice, reasonable foreseeability of harm, and negligence has been presented. The defendant did not heed Automasters' request to investigate who was "playing games with them" regarding the tampering of the brake lines on the subject vehicle. The defendant and its agents knew of the safety-issues presented by the loose brakes lines ten days before the alleged incident, but the railroad took no affirmative steps to provide a safe vehicle to Fletcher. Further, there exists evidence that defendant's agents did not comply with the custom and practice of the motor vehicle repair industry as the brake lines were repaired first on March 28, 2005, the brake lines had to be re-repaired after Fletcher's collision

of April 7, 2005, and the brakes underwent a third repair on April 12, 2005 – all of which did not "fix" the "soft" brake problem reported by the CRL Conductors who operated the vehicle. Under these circumstances, the plaintiff has made a prima facie case for resolution by a jury.

                                      Respectfully submitted

                                      William Fletcher, Plaintiff

                                By:   s/ William J. McMahon
                                      William J. McMahon

HOEY & FARINA
542 S Dearborn St Ste 200
Chicago IL 60605
Ph.: 312/939-1212